JOURNAL ENTRY and OPINION.
{¶ 1} Appellant P. C., natural father of S. G., appeals from the order of the juvenile court that granted his motion to modify legal custody, since it proceeded only to award that custody once again to S. G.'s mother, E. G.
 {¶ 2} Appellant asserts the juvenile court's order amounts to an abuse of its discretion for several reasons. Appellant argues that despite the juvenile court's findings that a change had occurred in the circumstances of both E. G. and S. G., that E. G. and her family had been noncompliant with previous court orders, and that E. G. should be terminated as S. G.'s legal custodian, the juvenile court made no change in S. G.'s custody. This court has reviewed the record and agrees with appellant's assertion. Consequently, the juvenile court's order is reversed and this matter is remanded for further proceedings.
 {¶ 3} S. G. was born on May 28, 1996 as the result of an affair between appellant and E. G. E. G. has had a history of mental illness since her diagnosis with schizophrenia in 1992. Appellant, a co-worker, had met her prior to her diagnosis and was aware of her condition. At the time of S. G.'s conception, E. G.'s condition had been under control due to medications; however, her medications were discontinued during the pregnancy.
 {¶ 4} Shortly after S. G.'s birth, the hospital nurses brought E. G.'s deteriorating mental condition to the attention of the Cuyahoga County Department of Children and Family Services ("CCDCFS"). Thus, a week after S. G.'s birth, the CCDCFS filed in juvenile court a complaint and a motion for pre-adjudicatory temporary custody alleging S. G. was a dependent child due to the mother's disabled mental condition.
 {¶ 5} S. G. at that time was placed with appellant's consent into the physical custody of a maternal great-aunt until the matter could be scheduled for adjudication and disposition. CCDCFS determined a case plan for E. G., her family, and appellant to follow. The case plan provided for E. G.'s participation in parenting classes, appellant's establishment of paternity of S. G., and E. G.'s father's pursuit of legal guardianship of E. G.
 {¶ 6} Two months later, the CCDCFS amended its complaint based upon everyone's compliance with the case plan. On September 6, 1996, the juvenile court adjudicated S. G. to be dependent, but placed her into E. G.'s legal custody under the CCDCFS' protective supervision.
 {¶ 7} On September 23, 1996, the Cuyahoga County Court of Common Pleas Probate Division determined E. G. to be incompetent and appointed J. G., E. G.'s father, to be her legal guardian. CCDCFS moved to terminate protective supervision of S. G. later that year. The juvenile court granted the agency's motion in January, 1997.
 {¶ 8} Subsequent to the termination of the agency's protective custody of S. G., appellant began to experience difficulties in relating to E. G.'s family. J. G. indicated appellant's visits to their home to see S. G. caused disruptions in the family's routine. In an effort to minimize the difficulties, appellant attempted to see S. G. in E. G.'s company outside her home.
 {¶ 9} These alternative visits, however, also proved unsuccessful. E. G. often was upset upon her return from the outings. When her parents questioned her about her moods, E. G. made outrageous accusations concerning appellant's treatment of her; E. G.'s distress led her parents to permit appellant even less access to their daughter and granddaughter.
 {¶ 10} On May 5, 1997 appellant filed a motion in the juvenile court seeking to establish "shared parenting" of S. G. Appellant attached to this motion a complete proposal concerning the terms of a shared parenting agreement. In late September, 1997 the juvenile court eventually responded by issuing an order that set forth a formal "temporary" schedule of visitation between appellant and baby S. G. Appellant's visits were to occur on "every other week from Friday at 6:00 p.m. through Saturday at 6:00 p.m. and the alternating weeks from Saturday at 6:00 p.m. through Sunday at 6:00 p.m. and each Wednesday from 5:30 p.m. through 8:30 p.m."
 {¶ 11} One week later, E. G. filed a motion to stay the temporary order. In her brief attached to the motion, she stated she had "reasons to be concerned for the child's safety" if appellant were granted such visitation. E. G. requested a hearing in order to elaborate. In the interim, the G. family refused to permit S. G. to visit with appellant.
 {¶ 12} On January 27, 1998 the juvenile court issued three separate judgment entries. One vacated the previous temporary order of visitation. The juvenile court directed S. G.'s guardian ad litem to "arrange for temporary visitation pending [further] hearing." That judgment entry was supplemented by an "interim pretrial order" dated the same day that permitted appellant to pick up and visit with S. G. each Wednesday from 6:00 to 7:00 p.m. and each Saturday from noon to 3:00 p.m. The juvenile court admonished appellant, E. G., J. G. and "any other person present" at the exchange to refrain from "abuse, harass[ment], threat[s], malign[ment], or speak[ing] ill of the other in the presence of the child." The third entry directed appellant, E. G. and J. G. to "take all action necessary to complete a custody and visitation evaluation through the [court] Diagnostic Clinic" for themselves and S. G.
 {¶ 13} Both appellant and E. G. filed motions in protest of parts of foregoing orders. In addition, E. G. filed a motion stating that because her legal guardian could protect her interests in the proceedings, she had no need for the appointment of her own guardian ad litem. The record reflects that neither E. G., her father J. G., or the child subsequently ever appeared for diagnostic visits at the court's clinic. Furthermore, appellant received no visitation with S. G. during the period of time beginning in late September, 1997 through November, 1998. J. G. instead began to make efforts on E. G.'s behalf to institute prosecutions by various authorities against appellant for "rape." None was successful.
 {¶ 14} In late June 1998 the juvenile court issued another "interim journal entry" that indicated E. G. and her legal guardian had been noncompliant with previous court orders. Neither of the two was penalized. Rather, appellant's "visits" with S. G., which actually had not occurred for nearly a year, were curtailed still further. The visits were to be supervised "by the Supervised Visitation Program" and to occur "one time for two hours every other weekend."
 {¶ 15} The juvenile court after a hearing issued still another "interim journal entry" on September 17, 1998. Therein, the court listed each example of the failure of E. G. and J. G. to comply with earlier court orders, again set forth appellant's visitation rights of every other week for two hours, informed the G.s they were not to have any person present on their behalf while appellant's visitations with the child took place, and notified the G. family they would be subject to contempt sanctions for any additional failures to comply.
 {¶ 16} The record reflects the juvenile court did not enforce the foregoing order; E. G. filed a motion to stay it. In October, 1998 appellant eventually filed a motion seeking sanctions against E. G. and J. G. for ignoring their duties. It was at this point after a fourteen-month gap in time that appellant's previously-allowed visits with his daughter finally began to take place, not at his home, but at the neutral location of a "Discovery Zone" facility. Moreover, they were sporadic; often, the G.s did not appear.[1]
 {¶ 17} Following another two hearings, the juvenile court issued a judgment entry on December 15, 1998. Appellant now was to have supervised visits with S. G. every Wednesday evening from 6:30 to 8:30 p.m. at the Euclid Public Library. E. G. and J. G. were given responsibility to transport the child for the visits, but later were to have a "third party" in attendance. The trial court further stated that "any person who violate[d the order] shall be held in contempt of court."
 {¶ 18} In March, 1999 appellant requested increased visitation with S. G. The juvenile court held a hearing on the request, but failed to make any provision for increased visitation.
 {¶ 19} Thus, in August 1999, appellant filed another request, this time seeking a modification "to the Juvenile Court standard visitation agreement." Appellant's affidavit indicated his wish to be involved in his daughter's life in the face of the G. family's continued recalcitrance. Appellant supplemented the request two months later with a formal motion to grant him "sole residential and custodial responsibilities for" his daughter.
 {¶ 20} The juvenile court eventually held a hearing in February, 2000 but issued a journal entry that addressed only a few minor matters. The court ordered J. G. to undergo, not a psychological evaluation, but rather, a deposition, and continued the hearing until May, 2000.
 {¶ 21} In April, 2000, J. G. filed a motion for protective order. When the juvenile court denied it, he filed an appeal of the denial.
 {¶ 22} Although J. G. ultimately dismissed his appeal, his action gave him an excuse to ignore the juvenile court's subsequent order of May 18, 2000 yet again to submit himself and the child to a psychological examination. In July 2000, Dr. Frank Ezzo, of the court's Diagnostic Clinic, notified the juvenile court J. G. had missed a fifth appointment that was scheduled for him. Ezzo further indicated his "concern" about the court's failure to include the other members of the family in the referral.
 {¶ 23} Appellant continued to experience difficulties in his efforts to see S. G. Despite the court order that a third-party was to be in attendance, she was brought to the library for the visitations only by either J. G. or E. G.'s sisters and never by E. G. J. G. refused to permit appellant's adult daughter to participate in the sessions. Occasionally, an ugly scene would occur, disrupting S. G.'s composure.[2]
 {¶ 24} On January 10, 2001 appellant filed a second motion seeking to gain "residential and custodial responsibilities" for S. G. Appellant further moved the juvenile court for an order to E. G. and her father to show cause for their noncompliance with the court's numerous previous orders. Appellant later amended the motion additionally to seek an order of referral to the Diagnostic Clinic for J. G., E. G., and the child.
 {¶ 25} The record reflects the juvenile court set the matter for hearing, but J. G. contested the service made upon him. The juvenile court denied appellant's request for a psychological referral and evaluation.
 {¶ 26} On August 1, 2001 the juvenile court began a hearing on the outstanding motions. S.G. by this time was five years old. Appellant called E. G. as a witness on his behalf; she could not maintain her equilibrium during her testimony. Appellant next called as a witness an assistant county prosecutor. Through her testimony, appellant established the J. G.'s animosity toward appellant had prompted him eventually to seek criminal prosecutions of appellant that lacked any foundation. In addition, S. G.'s newly-appointed guardian ad litem addressed the court to express "grave concerns about [her] ward's emotional state," adding S. G. appeared to be in "extreme risk of emotional harm" from her home situation.
 {¶ 27} Dr. Ezzo also testified. Ezzo stated appellant had been the only party to cooperate in completing a psychological evaluation. Ezzo found no indications that limited appellant's ability effectively to parent S. G. Ezzo found, however, on the G. family's part a "campaign of denigration" of appellant. This pattern indicated the existence of "parental alienation syndrome." Ezzo stated the syndrome causes "damage" to children.
 {¶ 28} Subsequent to Ezzo's testimony, the juvenile court continued the hearing for nearly three months. When proceedings re-commenced on November 26, 2001, appellant testified in his own behalf, and presented as witnesses his adult daughter and two police officers. Appellant also cross-examined J. G. The court refused to permit appellant to present the testimony of S. G.'s two previous guardians ad litem. Appellant's proffer of their testimony indicated they had observed the animosity displayed by the G. family toward appellant. For their part, the G. family called J. G. for direct examination, and presented the testimony of one of E. G.'s sisters.
 {¶ 29} At the hearing's conclusion, S. G.'s guardian ad litem presented her updated report. Although she believed S. G. was "being harmed negatively" by "the current situation as it stands," S. G. had expressed to her an "overwhelming anxiety" about the possibility of "being removed permanently" from her current home. The guardian ad litem believed S. G. "would not be able to survive emotionally if such a change were to occur." She therefore recommended appellant have increased visitation to the point his parenting would be "equal."
 {¶ 30} On January 29, 2002 the juvenile court entered its judgment entry. In relevant part, the court found that E. G.'s failures to comply with the court's many previous orders were not "willful" due to her mental disability. The court made no finding as to J. G.'s failures, apparently since the court had determined at the commencement of the hearing, despite an earlier pronouncement in the record to the contrary, J. G. was not a party to the proceeding. The juvenile court further found a change had occurred in both E. G.'s and S. G.'s circumstances since the original order of custody. Thus, it granted the appellant's motion for modification of the allocation of parental rights.
 {¶ 31} The juvenile court proceeded to terminate E. G. as legal custodian pursuant to R.C. 2151.353(A)(3). However, the court went on, pursuant to R.C. 3109.04, to "reallocate" primary parental rights and responsibilities to E. G. E. G. thus was re-designated as S. G.'s residential parent and legal custodian. Appellant was permitted more generous visitation with S. G.
 {¶ 32} Appellant has appealed the juvenile court's disposition of the case. He presents two interrelated assignments of error that state:
 {¶ 33} "The trial court committed reversible error when it granted father's motion to modify custody and then proceeded to re-designate the incompetent mother of the minor child as legal custodian.
 {¶ 34} The trial court committed reversible error when it excluded relevant probative testimony from guardians ad litem previously appointed in this case."
 {¶ 35} Appellant asserts the juvenile court's decision amounts to an abuse of its discretion partly on the basis the decision is unsupported by adequate evidence. The record supports appellant's assertion. The juvenile court failed utterly in its duties in this case.
 {¶ 36} Ordinarily, the discretion a trial court enjoys in custody matters, as well as in evidentiary matters, is accorded the utmost respect; given the nature of the proceeding and the impact the decision has on the lives of the parties concerned, appellate courts often defer to the trial court's decisions. Miller v. Miller (1988), 37 Ohio St.3d 71,74. Nevertheless, the trial court's discretion is not unbridled.
 {¶ 37} Pursuant to R.C. 2151.42, a court shall neither modify nor terminate a custody order "unless it finds * * * that a change hasoccurred in the circumstances of the child or the person who was granted legal custody, and * * * [it] is necessary to serve the bestinterests of the child." (Emphasis added.)
 {¶ 38} In applying the "best interests of the child" standard, the court is guided by the provisions in R.C. 3109.04(E)(1). Thus, the court must weigh in addition whether the harm resulting from change will be outweighed by the benefits. In re Kennedy (1994), 94 Ohio App.3d 414. The record's support of an affirmative answer to each of the three foregoing statutory "questions," makes a change in custody appropriate. Id.
 {¶ 39} R.C. 3109.04(F)(1) not only mandates the juvenile court weigh all relevant factors, but lists several that must be considered. The juvenile court is required, inter alia, to take into account the child's interaction and interrelationships with family members, to discover the "mental and physical health of all persons involved in the situation," to give thought to which parent is more likely to honor and facilitate visitation and companionship rights conferred by the court, and to mark any continuous and willful denials by the residential parent to accord the other parent his court-ordered right to visitation.
 {¶ 40} The record in this case demonstrates the juvenile court considered the applicable factors, but applied them to the wrong "question." The factors served merely as the basis for the court's conclusion a change in circumstances had occurred, rather than for the purpose of determining S. G.'s best interests. The juvenile court, indeed, refused to admit evidence relevant to R.C. 3109.04(F) factors. This constituted an abuse of discretion.
 {¶ 41} Clearly, the G. family's refusal to permit S. G. to associate with appellant and his family following the termination of protective custody constituted a change in circumstances. Doskoch v.Giffen (Dec. 21, 2000), Cuyahoga App. No. 77578. The juvenile court's "best interest" determination however, lacked a proper evidentiary basis. Sanders v. Sanders (Apr. 14, 2000) Darke App. No. 99 CA 1506. Appropriate sources of evidence were either discounted or precluded.
 {¶ 42} As the history in this case demonstrates, the record contains a chronicle of escalating alienating and obstructionist behavior on the part of the G. family that the juvenile court treated in a remiss fashion. In re: Roberts (Nov.5, 1997), Summit App. No. 18269. Dr. Ezzo, whose credentials as an expert were stipulated, opined that as S. G. grew older, the harm of such behavior would increase. Ezzo assessed appellant's psychological and home life stability, and appellant's success in raising his older child, and recommended S. G.'s best interest would be served by placement into appellant's residential custody.
 {¶ 43} The juvenile court gave less weight to Ezzo's recommendation since it necessarily was limited by J. G.' and E. G.'s refusal to submit to psychological assessment. Their refusal, therefore, was used as a justification for the court's decision to permit the status quo.
 {¶ 44} In effect, the juvenile court's custody decision made two "wrongs" into a "right." First, noncompliance with court orders, rather than being sanctioned, actually was rewarded. Second, the court based its "best interest" determination on a negative, i.e., a lack of proper evidence it had the duty to obtain.
 {¶ 45} The evidence in this case established the G. family wanted S. G. to have no relationship with either appellant or appellant's family. Moreover, in view of J. G.'s testimony alluding to chemotherapy, the evidence presented suggests that he and E. G. were in poor physical and mental health; the trial court apparently considered no other person in S. G.'s household to be important to its decision.
 {¶ 46} Appellant clearly had made efforts to comply with every court order. In stark contrast, the G. family, since the termination of protective custody of S. G. in late 1997, had in an escalating manner not only willfully and continuously refused but also vigorously fought any efforts to accord appellant his parental rights. Appellant was denied visitation with his daughter over continuous periods of many months during her most critical periods of growth. On this record, it frankly is impossible to conclude the G.s will act any differently in the future. Cf., Wheeler v. Wheeler (Oct. 20, 2000), Greene App. NO. 2000 CA27. The juvenile court added to its error by failing to permit the introduction of evidence from S. G.'s previous guardians ad litem that would have corroborated such a conclusion.
 {¶ 47} Additionally, the juvenile court based its "best interest" determination in large part on two improper "evidentiary" sources: the "medical" opinion of S. G.'s current guardian ad litem, who was not a psychologist; and hypothetical questions it posed ex parte and off the record to Dr. Ezzo.
 {¶ 48} The juvenile court in this case, therefore, issued an order that was both illogical and unsubstantiated by proper evidence. Consequently, it abused its discretion.
 {¶ 49} Appellant's assignments of error are sustained.
 {¶ 50} This order is reversed, and this case is remanded for further proceedings consistent with this opinion to determine whether S. G.'s best interests would be served by placement into appellant's legal custody.
It is ordered that appellant recover of appellee costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Court of Common Pleas Juvenile Court Division to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA ANN BLACKMON, J. CONCURS.
TERRENCE O'DONNELL, J. CONCURS IN JUDGMENT ONLY.
[1] According to appellant's records, S. G. missed at least each of the following visitation dates: in 1998, November 18 and 25, and December 9; in 1999, January 6 and 13, February 3, 10, 17 and 24, March 17 and 24; all of April and May, and June 2.
[2] In addition, the record reflects appellant noted S.G. did not appear for visitation with him on at least the following dates in 2000: March 1 and 15, April 12, May 10 and 24, June 9, August 18 and 25, when the G.s took her to Ireland on a vacation without notifying either the court or appellant, September 8 and 29, October 13, November 24.